### WOOLF et al. v. SMITH et al.

No. 2819.

Court of Civil Appeals of Texas. Beaumont.
July 3, 1935.

Rehearing Denied Sept. 25, 1935.

Fairchild & Redditt and Jas. W. Peavy, all of Lufkin, for appellants.

Dean & Humphrey, of Huntsville, Max M. Rogers, of Huntsville, and M. L. Bennett, of Normangee, for appellees.

WALKER, Chief Justice.

In 1917 J. W. Crow, deceased, and Mrs. Nellie Crow were married, and immediately established their homestead on J. W. Crow's river farm, consisting of 310 acres of land worth about $7,500. In 1927, in order to send their children to school, J. W. Crow bought a small place of less than two acres in the village of Apple Springs; the farm and this small place both being in Trinity county. He moved his family, consisting of his wife, Mrs. Nellie Crow, and four children, from the river farm in the fall of 1927, to the Apple Springs place and the children of school age were put in school; the family lived there until his death in 1932. During all that time J. W.

Crow made his headquarters on the river farm; the household furniture remained there; and the Apple Springs home was furnished with new furniture bought for that purpose. From 1927 until his death in 1932 J. W. Crow had a tenant family living with him in the home on the river farm. This farm was cultivated every year and the proceeds used for the support of the family. A crop on the farm had been started in 1932 at the time of Crow's death. In addition to his farming operations, Crow was also a game warden and constable at Apple Springs, where he voted in the school elections. There was no proof that the farm and Apple Springs were not in the same justice precinct and the same school district. From 1927 until the death of J. W. Crow in 1932 Mrs. Crow and the children visited the farm at week-ends, and spent the vacation months on the farm. After the death of her husband, Mrs. Crow moved back to the farm, and, on application for herself and the minor children born to her and J. W. Crow, the probate court set aside to them for homestead purposes 200 acres of the river farm. The administrator of the estate, joined by First National Bank of Groveton, as intervener, appealed from that order to the district court of Trinity county, where, upon trial to the court without a jury, judgment was entered overruling the judgment of the probate court, and denying Mrs. Crow and the children any homestead interest in the river farm, and setting aside to them as their homestead the Apple Springs place. In support of the judgment, the trial court filed conclusions of fact and law to the effect that J. W. Crow in his lifetime abandoned the river farm as his homestead, and acquired and appropriated for homestead purposes the Apple Springs property. During the litigation, Mrs. Crow married Arthur W. Woolf, who was made pro forma a party to all proceedings. The minor children were duly made parties and are also before us on this appeal.

We have carefully examined the entire statement of facts and have concluded that the conclusions of fact of the lower court have support in the evidence.

■ All parties concede the law to be that the husband, acting in good faith towards the rights of the wife and with no intent to defraud her of her homestead rights, can, without her consent and even against her wishes, abandon the homestead, with or without acquiring a new homestead. This proposition of law makes evidentiary only the testimony of Mrs. Crow that it was never her intention to abandon her home on the river farm.

There is no contention by the pleading or evidence that J. W. Crow, in dealing with the two places, perpetrated a fraud upon his wife or in any way attempted to perpetrate a fraud upon her on the issue of homestead.

On the conclusion of abandonment, the lower court found that the Apple Springs property was urban property, and, therefore that appellants could have no part of the river farm set apart to them, in addition to the Apple Springs property. The constitutional provision (article 16, § 51) defining the homestead reads as follows: "The homestead, not in a town or city, shall consist of not more than two hundred acres of land, which may be in one or more parcels, with the improvements thereon; the homestead in a city, town or village, shall consist of lot, or lots, not to exceed in value five thousand dollars, at the time of their designation as the homestead, without reference to the value of any improvements thereon; provided, that the same shall be used for the purposes of a home, or as a place to exercise the calling or business of the head of a family; provided also, that any temporary renting of the homestead shall not change the character of the same, when no other homestead has been acquired."

We take the following summary of the evidence from appellee's brief in support of the conclusion that the Apple Springs property was urban:

"Mrs. Crow testified that there were five or six stores in Apple Springs, that there was one main highway running through the town, and two churches, the Christian congregation using an old store building; that at the time the Crows moved to Apple Springs there was a railroad running through the town, a State Bank, and that the business part of the town was what everybody called the 'Old Town'; that the Baptist Church was around the block from the property where the Crows lived, that the Baptist Church property adjoined the Crow property; that there were several houses 'right around' the Baptist Church and the Crow home, and that there were houses between where the Crows lived and town.

"Woody Rowe, called as a witness for the appellants, testified that there were six

stores at Apple Springs, one owned by a Mr. Cox who had his house about one mile from his store, that Mr. Cox did not own his store building but rented the same; that another store was owned by a Mr. Salzer who owned a four or five acre homestead next to his store; that there were two churches, but only one building; that Brother Ashby was the Baptist pastor and did nothing but preach; that there was a school house and a five-teacher school, and one highway running through the town.

"Brother Ashby, called as a witness for appellants, testified that he was the Baptist minister at Apple Springs, that he had been there about a year and a half, that he lives in the parsonage and that he cultivated no land; that the Baptist Church was about one hundred yards from the Crow property, and the Crow property was about 200 yards from the stores, and that there were four or five houses in the neighborhood near his house and the Crow house. That he took the census about a year before the trial and there were 130 people, or something like that, living at Apple Springs, counting up and down the highway for about one-half a mile in each direction.

"C. W. Crow, brother of J. W. Crow, deceased, testified that the town of Apple Springs first began to grow about 1908 when the railroad was built through there, that a depot was built and the people began to settle around there. That at the time J. W. Crow bought his place, there were five or six stores, a blacksmith shop, a church, a bank, a post office and a little depot there. That Apple Springs was a pretty good sized little town with something like twenty-five or thirty residence houses.

"It was agreed that the town was not laid off in lots and blocks and the undisputed evidence was that it was not incorporated, had no sewage system, no public utilities, either gas, water or lights. That the Crow property was not designated by a lot and block number and that there was no city fire department or public department."

Under the evidence was Apple Springs a "town" or a "village," as those terms are used in section 51 of article 16 of the Constitution? In State ex rel. Taylor v. Eidson, 76 Tex. 302, 13 S. W. 263, 264, 7 L. R. A. 733, the Supreme Court defined town as "a collection of inhabited houses. The term carries with it the idea of a con-siderable aggregation of people living in close proximity. A town population is distinguished from a rural population, which is understood to signify a people scattered over the country, and engaged in agricultural pursuits, or some similar avocations requiring a considerable area of territory for its support."

In State ex rel. Wilke v. Stein et al. (Tex. Com. App.) 26 S.W.(2d) 182, 184 cited in Purdy v. Grove (Tex. Civ. App.) 35 S.W.(2d) 1078 (writ refused), a town was defined as "An aggregation of inhabitants and a collection of occupied dwellings and other buildings. * *. * 'The word carries with it the idea of a considerable number of people living in close proximity, as distinguished from a rural settlement. A town may, of course, exist without being incorporated, since its incorporation adds nothing to this distinct characteristic.' * * * The essential element of both a town and village is human habitation."

In Mikael v. Equitable Securities Co., 32 Tex. Civ. App. 182, 74 S. W. 67, 68 (writ denied), a village was defined as "A small assemblage of houses, less than a town or city, and inhabited chiefly by farmers and other laboring people. * * * 'Any small assemblage of houses for dwellings or business or both in the country, whether they are situated upon regularly laid-out streets and lots or not.'"

See, also, State v. Stein (Tex. Com. App.) 26 S.W.(2d) 182; Ralls v. Parrish, 105 Tex. 253, 147 S. W. 564; State v. Eidson, 76 Tex. 302, 13 S.W. 263, 7 L. R. A. 733.

In State v. Stein, supra, the Supreme Court held that a town may exist without being divided into lots; that a map or plat of an unincorporated town is ineffectual, on the one hand, to extend the boundaries of a town beyond its habitation, as evidenced by the collection of inhabited houses, and on the other hand to prescribe the limits of such town within the space of such map or plat, where the collection of houses extends beyond the platted limits. The court then proceeded to say: "This being true, it is proper to say that the situs of an unincorporated town will not be controlled by the plotted area of such town without reference to the collection of inhabited houses, which together with the area appurtenant to same in the ordinary signification of the meaning of the word constitute the town."

So it was not controlling that Apple Springs was not incorporated and was without a map or plat.

The character of the Apple Springs property, as to whether urban or rural, must be determined, not by the occupation of J. W. Crow, nor by the fact that he used the revenues of the farm to support his family, but upon the issue of whether or not the town of· Apple Springs was a "town" or "village," as those terms are used in the Constitution, and, if a "town" or "village," whether or not the Apple Springs property was a constituent part of the "town" or "village." In Posey v. Bass, 77 Tex. 512, 14 S. W. 156, 157, our Supreme Court said: "It is the place of the homestead that gives character to it, not the business of the head of the family. If it be in the country, it is a rural homestead; if it be in a city, it is an urban residence."

See, also, Wilder v. McConnell, 91 Tex. 600, 45 S. W. 145; Jones v. First National Bank (Tex. Com. App.) 259 S. W. 157; Ewing v. Riley (Tex. Civ. App.) 246 S. W. 94.

[2] On the authorities cited we cannot escape the conclusion that the lower court was justified in finding that Apple Springs was a town or village within the constitutional use of those terms.

The testimony was undisputed that the property bought by J. W. Crow in 1927 for the use of his family was within the thickly settled portion of the town of Apple Springs, or at least within the limits of territory commonly known by that name. We therefore affirm the conclusion that the Apple Springs property was urban.

▮ Where two separate and distinct places are in controversy, one rural and the other urban, on the issue whether the family has moved from the rural to the urban, abandoning the rural home and acquiring a new homestead on the urban, the question of abandonment of the rural home and the acquisition of new homestead rights in the urban property is a simple issue of fact to be decided upon the preponderance of the testimony; the trier of this fact issue, whether the jury or the judge, is the judge of the weight of the testimony and the credibility of the witnesses. The verdict of the jury, or the fact conclusion of the trial judge on that issue, is binding upon us and must be affirmed where it has support in the testimony. In ·Derry v. Harty, 187 S. W. 343, 344, the Court of Civil Appeals said:

"The principal contention is that the court erred in finding as a fact that appellant had abandoned the property in question as her homestead.

"There being no jury, the findings of the court must be treated as we would the verdict of the jury; and, if there is any evidence to support it, the judgment must be sustained. See Wells v. Yarbrough, 84 Tex. 660, 19 S. W. 865. The court in such cases is the sole judge of the credibility of the witnesses and the weight of the testimony: * * *

"While the evidence, as we have seen, would have sustained a finding in favor of appellant, still, there is ample evidence, in our opinion, to support the judgment of the court, for which reason the same is in all things affirmed."

In Cockerell v. Callaham (Tex. Civ. App.) 257 S. W. 316, 317, 320, the court said: "Had the trial court found from the evidence that appellees had abandoned their former home and acquired an urban home, we would not disturb such finding; but we are not prepared to hold that there was no probative evidence to support the finding of the court that said former home had not been abandoned at the time of the execution of the deed to appellant."

See, also, Hart v. Hulsey · (Tex. Civ. App.) 196 S. W. 302; Cannon v. Hathaway (Tex. Civ. App.) 12 S.W.(2d) 618; Tuerpe v. Live Stock Commission Co. (Tex. Civ. App.) 245 S. W. 741; Wells v. Yarbrough, 84 Tex. 660, 19 S. W. 865.

What we have said overrules appellants' contention that appellees were required to establish by clear and convincing testimony that J. W. Crow had abandoned his homestead rights on the·river farm and had acquired new homestead rights in the Apple Springs property.

▮ In the opening statement, we have summarized the principal facts relied upon by appellants to support their conclusion that the homestead on the river farm had not been abandoned. It would serve no useful purpose to make a detailed statement of appellants' testimony. It is sufficient to say that they made a strong case in favor of their claimed homestead on the river farm; and we say further, in view of the argument advanced by appellants,

that the testimony as a whole does not "clearly and satisfactorily" support the issue of abandonment; the finding on that issue can be affirmed only on the conclusion that it has support in testimony which the trial court, as judge of the weight and credibility of the testimony, had the right to accept as true. The question, then, is whether or not the finding of abandonment by the trial court has support in the evidence.

Upon the testimony as a whole, we cannot say that he abused his discretion in finding that J. W. Crow had abandoned his homestead on the river farm.

The issue of abandonment has support in the following testimony. L. P. Atmar, called as a witness for appellees, testified as follows, questions and answers reduced to narrative:

"I am the president of the First National Bank of Groveton and also president of the First State Bank of Groveton. I knew Mr. J. W. Crow, also known as Walt Crow, during his lifetime. He was killed in 1932, I believe; I had known Mr. Crow before his death about thirty years. I was intimately associated with him; I have had a good many business dealings with him. The first time I began to have business dealings with Mr. Crow was about the time we opened up this bank here, in 1901. From that time on he was our bank's customer. He was out of the State a year or two a good many years ago but when he was around in reach of us he did business with the bank. He did his personal business with me individually. I became acquainted with Mr. J. W. Crow's business affairs, and he discussed all his business affairs with me during that time. I am acquainted with the location of the farm land of the J. W. Crow estate, the place on the river. Mr. Crow bought some of that property and when he inherited some property from his Aunt's estate and traded that to the Trinity County Lumber Company for some other land. I don't remember the year Mr. and Mrs. Crow were married. I was familiar with the business affairs of J. W. Crow in 1917. The property of the J. W. Crow estate out there at the time he married was all paid for. A part of it was in exchange for property that he inherited. During the years up to 1927, the year that Mr. Crow bought the place in Apple Springs—my records show that he owed about $1,500.00 in 1927 at the bank. I don't remember how much he owed the bank just prior to that time. I didn't look up the records on it. He usually got whatever he wanted, whatever it was. But my recollection is that he never owed any more than a much larger sum than that. The way he took care of that indebtedness was that part of the time he was working for the Trinity County Lumber Company on a salary, and a part of the time he raised cattle and farmed, and when his crops were harvested in the fall he would pay off the indebtedness, and if it wasn't sufficient I would carry it over for him. Mr. Walt Crow discussed with me the matter of moving to Apple Springs. He talked to me about acquiring that Apple Springs property when he first commenced thinking about it. He told me that he wanted to buy a place up there; he said he wanted to send his children to school. He said he wanted to get out of the bottom, that it was sickly down there. He asked my advice, as a business proposition. I told him that I thought it would be a good thing for him. The way he got the money that he used to make the down payment on this place was we released some money on this property that we had a mortgage on—we released it; he discussed that with me and got my consent to do that. He told me he was acquiring that place as a home. I don't remember the date he moved to Apple Springs, but he moved there shortly after that. While he was living at Apple Springs he discussed with me the matter of a sale of the farm property down there on the river. He told me that he wanted to sell it and pay his debts and buy a smaller farm near Apple Springs. He asked me to assist him. He asked me to help him look for a place. I assisted him in looking out for a place, and the trade was being considered at the time of his death. I had found a prospective purchaser for his place. I had advised Mr. Crow of that fact; Mr. Leon Womack was figuring on it. Leon Womack was planning to buy this place. At the time of Mr. Crow's death the trade was being discussed. Mr. Crow discussed it with me one Sunday morning about a month before his death, the last time. He did not discuss with Judge Crow, in my presence, the matter of Judge Crow assisting him in buying a place."

"After I had that discussion with Mr. Crow about acquiring the Apple Springs place, and after he moved on the place, I

had further conversation with him in which he told me that he had purchased the place, several times. He told me that he had acquired it for a home. Mr. Crow told me that. Since I recall about the payments on this place, he sold a piece of property down there to Mr. Woody Ross. I think I handled those notes on that property, and maybe Mr. Hutson handled some of them. I think he paid about $1,600.00 for the Apple Springs place. He never made any statement to me about whether or not he intended to move back on the farm. At the time he acquired the Apple Springs place he asked me to find him a purchaser for that place, in order that he might acquire a home and a farm closer to town. He told me that he expected to make the property in Apple Springs his home. After 1927, and before Mr. Crow's death, his indebtedness to the First National Bank increased considerably. My records show the amount of his indebtedness at the time of his death. The date of the last loan or renewal of loan was December 3, 1931. At that time he gave me a financial statement of his indebtedness. For several years prior thereto every time we settled up I would take a new financial statement from him. I have that financial statement with me. J. W. Crow signed that statement. He signed it in my presence. The statement reads as follows:

" 'Customer's Statement on Which Credit was Given. Statement of
· J. W. Crow.

" 'Address: Apple Springs

" 'First National Bank, Groveton, Texas.

" 'For the purpose of procuring credit, from time to time, with the above bank for my negotiable paper, or otherwise I furnish the following as being a fair and accurate statement of my financial condition on the 3" day of Dec. 1931.

| Assets | Valuation |
| --- | --- |
| 310 A. | $7,750.00 |
| (For Legal Description see Blank side) | |

| Personal Property | Valuation |
| --- | --- |
| 2 Horses | 100.00 |
| 3 Mules | 300.00 |
| 135 cattle | 2,700.00 |
| 250 hogs | 1,000.00 |
| 75 goats | 100.00 |
| Machinery, farm, | 500.00 |
| Grain, Corn, 1000 Bu., | 500.00 |
| Cotton, Cane Syrup | 300.00 |
| Mds., Car | 300.00 |
| Home $1,500.00, less debt, 370., | 1,130.00 |
| Cash | |
| Bonds | |
| Stock | |
| Due you on Loans, etc., | |
| Total, | $14,680.00 |

| Liabilities | Amount |
| --- | --- |
| Encumbrance on Personal Property and Other Liabilities: | |
| Owing your bank | $ 2,800.00 |
| Owing other banks | |
| All other debts | |
| Total Debts | |
| Net Worth, | $11,880.00 |
| | |
| Total, | 14,680.00 |
| Life Insurance. | |

" '[Signed] J. W. Crow.

" 'The above is a correct copy of a signed financial statement on file in our office.
" 'L. P. Atmar, Prest.'

"This item up here '310 A' means 310 acres of land. The total value of that is $7,750.00. That's Mr. Crow's estimate of the value of that. That estimate was placed on that property by Mr. Crow in my presence."

"And down here where it says 'Home $1,500.00, less a debt of $370.00, total $1,130.00', that was the Apple Springs home, less $370.00 that he owed on it. The 310 acres listed up here at $7,750.00 was the farm. And down here the home place in Apple Springs is listed at $1,500.00 less $370.00, making a total of $1,130.00. Mr. Crow was the one that used that word 'Home' there. Mr. Crow represented to me that the place in Apple Springs was his home at the time he gave me this financial statement. As to whether he ever made any statement to me about whether or not the 310 acres was subject to execution or subject to the payment of his debts, yes sir, he offered to give me a Deed of Trust on it, and I told him that it wasn't necessary. I knew that if Mr. Crow lived he would pay the debt. If I had had any doubt in my mind that that property, or any part of it, was claimed by Mr. J. W. Crow as a homestead, I would not have increased the amount of his indebtedness at the bank as it was increased. I relied upon his representations that that property was subject to the payment of his debts. I relied upon his state-

ment that the place in Apple Springs was his home, and increased his indebtedness from about $1,500.00 to about $3,100.00. I felt that the 310 acres of land was ample security for his debt."

"As early as the year 1928 Mr. J. W. Crow made a financial statement to me in settling up his obligations with the bank, he made one each year. He denominated the Apple Springs place just as he did there; in each of these statements he called it his home. He listed the other property separately, the 310 acres. I am acquainted with real estate values in that end of the county, some. I have been dealing in real estate all over Trinity County for a long number of years, and have owned and sold land in that locality out there, and have familiarized myself with the value of real estate in that locality. The fair value of that 310 acres at this time, under present conditions, I would think would be about $15.00 an acre. Then the 310 acres, if 200 acres is set aside to Mrs. Crow leaving 110 acres, would be valued at about $1,500.00; it would not be worth that if she picked the best of the land and left us out in the woods. From the description of the land you've handed me I could not tell about the tract of land that is sought to be established as her homestead there, I could not tell about it without being acquainted with the location on the ground. The 110 acres left there would be worth about $1,500.00 so far as I know. That would not be sufficient to pay off half the loan of the First National Bank. If the representations made by Mr. Walt Crow to me that the property out there was subject to execution, and my reliance on that financial statement from him to me, if they were true, my bank would be damaged by that representation; certainly would be. At the time this financial statement was made to me, and these representations were made in the financial statement about the condition of the land, that is that the 310 acres was subject to execution, and that the Apple Springs place was his homestead, I will say that I relied on that statement and either renewed Mr. Crow's obligations and at times allowed him more money. And without that I would not have allowed his indebtedness to have been increased. I believed those representations were true at the time he made them. I don't know when he made the first financial statement to me, it was so far back. We had been taking them for fif-

teen years. I never did go out to the house at Apple Springs with him. I never talked to Mrs. Crow about this."

C. H. Crow, brother of J. W. Crow, deceased, testified as follows:

"I have lived in Trinity County all my life, sixty-six years. J. W. Crow, deceased, was my brother. During the last few years, in 1928, during that year, 1929, 1930; and up to his death in 1932 during that time, every year, he was an officer and I was County Attorney, and he was in consultation with me. During the last two years of his life he was Constable and Game Warden, and then he was appointed a Constable again out there. I think he held that position when he died. I know where my brother, J. W. Crow, claimed his home to be at the time of his death and for a few years immediately preceding that. That was at Apple Springs. As to whether he ever discussed with me at any time the matter of the purchase of the place at Apple Springs before he bought it, yes sir, he talked with me about a location to send his children to school. And after I got into office and he was with me and acting as an officer, and I was County Attorney, I don't know how many times he asked me to locate a purchaser for his place on the river—the place he moved from—and I don't know whether it was once or twice, or it may have been oftener, but he told me that, or I understood that, Leon Womack and Edgar Womack would like to buy it, and he told me to contact them, and I talked to Mr. Atmar about it, and I told my brother that I had talked to Mr. Atmar about the matter. During those conversations he told me that he could not move back to the farm to live, that he could not send his children to school, and that he didn't have any health there, and he said that he could not live there. He said that he moved away from there on account of his health and on account of the inconvenience of the school. I remember the school tax elections up at Apple Springs, and that my brother, J. W. Crow, was interested on the same side with the school. During the time that school controversy was going on down there he told me that he was doing everything that he could to have a school down there, and if he couldn't he was going somewhere where he could have one. He said he was going to move to Lufkin if he couldn't have a school at Apple Springs. If he said anything about selling his place in Apple Springs in that

conversation I don't remember it. Walt Crow lived during the time that he was Constable, and called his home Apple Springs. He voted at Apple Springs I think. I know that he voted there when they were voting on the school taxes; that is where he voted because he run for office there. I don't know whether the Apple Springs voting box is different from that in which the farm was located. The way they went from Apple Springs to the farm it must have been about eight miles. I think that is what he called it. I know it was a very bad road that way. I have known of the town of Apple Springs—it first began to grow in about 1908, I think that is the year. The road went through there and a little depot was built, and from that the people began to settle there. At the time Walt bought the place there there was several stores there, a blacksmith shop and a church there—a combination—several congregations used it—and a bank there and a post office and a little depot. There must have been five or six stores. There were several residence houses up and down the road. It was a pretty good size little town. I would think that there would be as many as twenty-five or thirty residence houses there."

Our Supreme Court has said that the most satisfactory evidence of the abandonment of the homestead rights in one piece of property is the acquisition of a new homestead. Slavin v. Wheeler, 61 Tex. 654. In Bell v. Crabb, 244 S. W. 371, 372, reviewing the evidence with reference to the abandonment of a former homestead and the acquisition of a new homestead, the Commission of Appeals, speaking through Judge McClendon, said: "The acquisition of title to residence property, coupled with its occupancy and use by the family as a home, constitute the highest and most conclusive evidence of its homestead character."

Again, in Chalk v. Daggett, 257 S. W. 228, 231, in speaking upon this question, the Commission of Appeals said: "Evidence of removal from a former to a new homestead, unaccompanied by evidence of an intention on the part of the head of the family to return to the old, or make temporary his new, residence, presents a case of abandonment. Bell v. Crabb (Tex. Com. App.) 244 S. W. 371."

In the case of Hinton v. Uvalde Paving Co., 77 S.W.(2d) 733, 736, in which a writ of error was refused, the Court of Civil Appeals at Dallas, speaking through Justice Looney, said: "Their removal from the Catherine street place to the Pacific avenue place, and its occupancy and use as a homestead, unaccompanied by any act evidencing an intention to return to the former home, silently, but effectively, proclaimed it to be their homestead, and constituted the highest and most conclusive evidence of the abondonment of the Catherine street property as a homestead. Bayless v. Guthrie (Tex. Com. App.) 235 S. W. 843, 845; Bell v. Crabb (Tex. Com. App.) 244 S. W. 371, 372; Chalk v. Daggett (Tex. Com. App.) 257 S. W. 228, 231; American Exch. Nat. Bank v. Jeffries (Tex. Civ. App.) 36 S.W.(2d) 558."

In Chalk v. Daggett, supra, reference was made to the "intention on the part of the head of the family to return to the old, or make temporary his new, residence," as presenting a case of abandonment. In the case at bar two witnesses testified that J. W. Crow had told them he was not going to return with his family to the river farm, giving as his reasons that it was unhealthy and that it was without school facilities.

It follows that the judgment of the lower court should be in all things affirmed, and it is accordingly so ordered.